# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
Cloud Mobile Phone Seized from Brian Gilpin and Erica ) Case No. '22 MJ1453
Gilpin on June 30, 2021 at the San Ysidro Port of Entry )
)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC sec. 952, 960, 963 | Conspiracy to Import Controlled Substances, Importation of Controlled Substs |
| 31 USC sec. 5332 | Bulk Cash Smuggling |

The application is based on these facts:
See Attached Affidavit of HSI Special Agent Dante Reynolds, incorporated herein by reference.

☐ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Dante J. Reynolds*
*Applicant's signature*

Special Agent Dante Reynolds, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___telephone___ *(specify reliable electronic means)*.

Date: 04/26/2022

*Allison H. Goddard*
*Judge's signature*

City and state: San Diego, California       Hon. Allison H. Goddard, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Special Agent Dante Reynolds, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

> one Cloud Mobile phone (**Target Device 1**),
>
> one Kodak Mobile phone (**Target Device 2**), and
>
> one Tech Pad phone (**Target Device 3**),

seized from Brian GILPIN and Erica GILPIN on June 30, 2021, at the San Ysidro Port of Entry and identified by Brian and Erica as their phones (the "**Target Devices**"), as further described in Attachments A-1 through A-3, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 952, 960, and 963, and Title 31, United States Code, Section 5332, as further described in Attachment B. The requested warrants relate to the investigation and prosecution of Brian GILPIN and Erica GILPIN for the noted offenses. The **Target Devices** are currently in the custody of Customs and Border Protection, located at 9725 Via De La Amistad, San Diego, CA 92154.

2. As I note further in this affidavit, in June 2021, investigators searched the **Target Devices** pursuant to consent provided Brian and Erica. I now seek authority to search them again.

3. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the Target Device, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

4. I have been employed as a Special Agent with Homeland Security Investigations (HSI) since July 2017. I am currently assigned to the HSI Office of the Deputy Special Agent in Charge (DSAC), in San Diego, California. I am a graduate of the

1

Criminal Investigator Training Program (CITP) and the HSI Special Agent Training (HSISAT) at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. Prior to my tenure with HSI, I was employed by the U.S. Border Patrol (USBP) and the Federal Air Marshal Service (FAMS); I have been serving as a federal Law Enforcement Officer (LEO) continuously since May 1998. I have also attended courses on searching and reviewing electronic devices and social media, some of which were presented by the California Narcotics Officers Association (CNOA), in December 2018.

5.      During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry (POE).

6.      I am aware that it is common practice for drug traffickers to work in concert utilizing cellular telephones. A common tactic utilized by traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles that enter the United States at Ports of Entry, and to conceal bulk cash proceeds in cars that travel from the United States to Mexico. With respect to the movement of controlled substances and cash proceeds in this manner, I am aware that traffickers in Mexico frequently communicate with the individual ("the driver") responsible for driving the vehicle containing the concealed substances and cash between the United States and Mexico. These communications can occur before, during and after the drugs and cash are smuggled between the United States and Mexico. For example, prior to the smuggling, traffickers frequently communicate with the driver regarding arrangements and preparation. When the smuggling is underway, narcotics traffickers frequently communicate with the driver to remotely monitor the progress of the narcotics, provide instructions to the driver and warn accomplices about law enforcement activity.

When the narcotics have been imported into the United States, narcotics traffickers may communicate with the driver to provide further instructions regarding the transportation of the narcotics to a destination within the United States.

7. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the importation of narcotics may yield evidence:

   a. tending to indicate efforts to smuggle controlled substances and cash proceeds from trafficking between Mexico and the United States, and to conspire to do so;

   b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling of controlled substances and cash proceeds from trafficking between Mexico and the United States, and to conspire to do so;

   c. tending to identify co-conspirators, criminal associates, or others involved in smuggling controlled substances and cash proceeds of trafficking between Mexico and the United States, and to conspire to do so;

   d. tending to identify travel to or presence at locations involved in the smuggling of controlled substances and cash proceeds of trafficking between Mexico and the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

8. According to the report of CBP Officer Ronquillo, on June 30, 2021, the Officer was conducting pre-primary inspections at the San Ysidro Port of Entry, with a K-9 Unit. At about 6:40 p.m., the Officer came across a 2000 tan Ford Explorer with Washington license plates (WA-BTT2526), being driven by Brian GILPIN. Erica GILPIN was in the front passenger seat, and was the only other occupant of the car. The Officer's K-9 Unit sniffed the Ford Explorer and alerted on the spare tire. At that point, the Officer alerted CBP Officer Garcia, who removed Brian from the car.

9. According to the report of CBP Officer Garcia, at about 6:45 p.m. on June 30, Officer Garcia received an alert from Officer Ronquillo, who was seeking assistance on Lane 27 at the Port of Entry. Officer Garcia responded and made contact with Brian. Brian gave Officer Garcia two negative declarations, and said that he was going to San Diego and visiting from Washington. Officer Garcia scanned the spare tire with his Buster Contraband Detector, and found (per the detector) that the density of the spare tire was anomalously high. (In other words, the density of the tire was higher than it would be if it contained air.) Officer Garcia removed Brian from the Ford Explorer, placed him in handcuffs, and escorted him to the security office.

10. Per the report of CBP Officer Ortega, at about 6:45 p.m., the Officer scanned the Ford Explorer in the "Z-Portal" X-Ray machine. The Officer saw anomalies in the spare tire and the rear, passenger-side quarter panel.

11. Per the report of CBP Officer McDonald, at about 7:45 p.m., the Officer was assigned to conduct a physical inspection of the Ford Explorer. The Officer found five

4

packages hidden in the rear passenger quarter panel. The Officer also removed the spare tire from the car and found fifteen additional packages in it. The Officer conducted presumptive testing on the contents of the packages, which was a white powdery substance, and found it tested presumptively positive as cocaine. Subsequently, DEA lab testing confirmed that the packages contained about 10 kilograms of cocaine. The Officer placed Brian and Erica under arrest.

12. I responded to the Port of Entry to interview Brian and Erica, who both received and waived their *Miranda* rights. In their post-arrest interviews, both Brian and Erica denied knowing that drugs had been hidden in the Ford Explorer. Brian told me that the people he had been staying with in Mexico had stolen the car and had it for about two weeks. He claimed that he had stolen it back from them a week prior, and that he was the only person who had controlled the car for the prior week. He also told me that a man named Oscar had hired him to pick up money in the United States and bring it to Mexico. He also said that he thought he was picking up $26,000, and was to be paid $3,000. Erica told me that a compartment had been installed in their car, and that they were supposed to pick up $30,000 in San Diego and bring it to Mexico. She also said that the people whom they were staying with had held their car for two weeks, and identified Oscar as the person who hired them. And they identified the **Target Devices** as their own, and gave consent to search them.

13. Brian and Erica were charged with importation of controlled substances in violation of 21 U.S.C. §§ 952 and 960. In April 2022, a grand jury returned an indictment against them for this charge, and for conspiring to import controlled substance in violation of 21 U.S.C. §§ 952, 960, and 963. From my training and experience, I am aware that people who smuggle bulk cash from San Diego to Mexico are generally doing so to help Mexico-based drug traffickers recover the profits from their drug smuggling and trafficking activity. In this regard, bulk cash smuggling is, I am aware, both a criminal offense and evidence of participation in conspiracies to conduct drug smuggling and trafficking.

14. In June 2021, investigators searched the **Target Devices** pursuant to consents given by Brian and Erica. Investigators were able to obtain some information from the forensic downloads of the phones from last summer, but I believe it is possible that a new search can generate more useful forensic downloads. In general, I am aware that forensic software programs used to download phones are regularly updated; these updates, in my experience, can help generate more comprehensive downloads of phones. For this reason, subsequent downloads of the same phone later in time can yield more information.

15. Here, I also note that I received consent from Brian and Erica to review their phones. Nevertheless, given the passage of time since they provided the consent, I seek this authority to search the phones again.

16. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memories of the Target Devices.  In light of the above facts and my experience and training, there is probable cause to believe that Brian and Erica were using the Target Devices to communicate with others to further the importation of illicit narcotics into the United States.

17. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as Defendants, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Based upon my review of border crossing records including photographs taken by license plate reader cameras, Brian and Erica crossed southbound into Mexico via the San Ysidro, California Port of Entry for the first time on May 15, 2021, driving the

2000 tan Ford Explorer referenced in ¶ 8 above. Both Brian and Erica stated their permanent address was in the state of Washington during their post-arrest interviews. Given the geographic distance between Washington state and the United States-Mexico border at the San Ysidro Port of Entry, in my training and experience it is likely that Brian and Erica were coordinating with others in advance of their May 15, 2021 entry into Mexico. In light of these facts, I seek authority to search the Target Devices for materials falling within the scope of Attachment B over the date range of March 1 through July 1, 2021.

## METHODOLOGY

18.  It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the

7

results using digital photography. This process is time and labor intensive and may take weeks or longer.

19. Following the issuance of this warrant, I will collect the **Target Devices** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

20. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this Court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

21. As noted, Brian and Erica signed consent forms for the Target Devices during their post-arrest interviews. Investigators conducted a forensic download of the **Target Devices** at that time.

## CONCLUSION

22. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the Target Devices will yield evidence of violations of Title 21, United States Code, Sections 952, 960, and 963, and Title 31, United States Code, Section 5332. Accordingly, I request that the Court issue warrants authorizing law enforcement to search the items described in Attachments A-1 through A-3 and seize the items listed in Attachment B using the above-described methodology. I swear the foregoing is true and correct to the best of my knowledge and belief.

*Dante J. Reynolds*
Special Agent Dante Reynolds
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone this 26th day of April, 2022.

*Allison H. Goddard*
Honorable Allison H. Goddard
U.S. Magistrate Judge

## ATTACHMENT A-1

PROPERTY TO BE SEARCHED

The following property is to be searched:

One Cloud Mobile phone (**Target Device 1**) seized from Brian GILPIN and Erica GILPIN on June 30, 2021, at the San Ysidro Port of Entry and identified by Brian and Erica as their phones

The Target Device is currently in the possession of Customs and Border Protection (CBP), located 9725 Via De La Amistad, San Diego, CA 92154.

## ATTACHMENT B

ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachments A-1 through A-3 (the "**Target Devices**") includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data from between March 1, 2021 and July 1, 2021:

a. tending to indicate efforts to smuggle controlled substances and cash proceeds from trafficking between Mexico and the United States, and to conspire to do so;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling of controlled substances and cash proceeds from trafficking between Mexico and the United States, and to conspire to do so;

c. tending to identify co-conspirators, criminal associates, or others involved in smuggling controlled substances and cash proceeds of trafficking between Mexico and the United States, and to conspire to do so;

d. tending to identify travel to or presence at locations involved in the smuggling of controlled substances and cash proceeds of trafficking between Mexico and the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

      f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963, and of Title 31, United States Code, Section 5332.